

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-07-00174-CR

_____

MICHAEL ALAN LOUN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 4th Judicial District Court
Rusk County, Texas
Trial Court No. CR05-140

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Michael Alan Loun appeals his conviction by a jury for murder while under the immediate influence of sudden passion. The victim, Jack Edward LaPelley, III (referred to in the record as Trey LaPelley), knocked on the door of the apartment of Loun's girlfriend, Jodi Clark, and demanded entry. Five persons were present in the apartment including Loun and Miranda Fancher, LaPelley's girlfriend. LaPelley, who was intoxicated, wanted to talk with Fancher. Because LaPelley had a history of physically abusing Fancher, Clark assumed Fancher would not want to talk with LaPelley. After telling LaPelley to leave through the closed and locked door, Clark then opened the door a crack and LaPelley forced his way into the apartment. Loun ordered LaPelley to leave. When LaPelley refused, Loun pointed a gun at LaPelley and demanded that he leave. LaPelley responded by attempting to slap the gun out of Loun's hand. When Loun recovered his balance, Loun shot LaPelley three times. The State indicted Loun for murder. The first trial resulted in a hung jury. The second trial resulted in a unanimous verdict finding Loun guilty, but the jurors were unable to agree on punishment. The trial court declared a mistrial on punishment only.[1] In the third trial, the jury found Loun acted under the immediate influence of sudden passion and assessed a sentence of

---

[1] The Texas Code of Criminal Procedure was amended in 2005 to permit a trial court, when the jury fails to agree on punishment, to declare a mistrial only on punishment. *See* Act of May 20, 2005, 79th Leg., R.S., ch. 660, § 1, 2005 Tex. Gen. Laws 1641 (current version at TEX. CODE CRIM. PROC. ANN. art. 37.07, § 2(b) (Vernon Supp. 2008)); Act of May 20, 2005, 79th Leg., R.S., ch. 660, § 2, 2005 Tex. Gen. Laws 1641 (codified at TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(c) (Vernon 2006)). Loun does not challenge the trial court's declaration of a mistrial on punishment only.

ten years. Loun appeals the guilty verdict resulting from the second trial, and the punishment assessed in the third trial.

Five issues are raised on appeal. Loun challenges the legal and factual sufficiency of the evidence supporting the jury's guilty verdict. In addition, Loun argues the trial court erred in removing part of the statutory instruction on parole from the charge submitted to the jury and refusing to instruct the jury on the conditions of community supervision. Finally, Loun argues the trial court erred, during the third trial which only involved punishment, in admitting the prior recorded testimony of Rashaan Roberson.

## I. The Evidence Is Legally and Factually Sufficient

Loun challenges the legal and factual sufficiency of the evidence in his first two points of error. Loun argues the State's evidence is too weak to support the jury's finding of guilt and rejection of Loun's self-defense claim. According to Loun, no rational juror could have rejected his self-defense claim. In the alternative, Loun argues the jury's verdict is against the great weight and preponderance of the evidence.

In raising the justification of self-defense, a defendant bears the burden of production, which requires the production of some evidence that supports the particular justification. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804

3

S.W.2d at 913–14. The burden of persuasion does not require the production of evidence, but rather only requires that the State persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14; *Kelley v. State*, 968 S.W.2d 395, 399 (Tex. App.—Tyler 1998, no pet.). A jury verdict of guilt results in an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006); *cf. Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

"Deadly force" is defined as a "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE ANN. § 9.01 (Vernon Supp. 2008); *Holmes v. State*, 830 S.W.2d 263, 265 (Tex. App.—Texarkana 1992, no pet.). A person is justified in using deadly force against another:

4

(1)     if he would be justified in using force against the other under Section 9.31;

(2)     if a reasonable person in the actor's situation would not have retreated; and

(3)     when and to the degree he reasonably believes the deadly force is immediately necessary:

(A)     to protect himself against the other's use or attempted use of unlawful deadly force; or

(B)     to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Act of May 16, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008)).[2]  A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3598 (amended 1995) (current version at TEX. PENAL CODE ANN. § 9.31 (Vernon Supp. 2008)).[3]  "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death,

_____

[2]In 2007, the Texas Legislature amended Section 9.32 and removed the duty to retreat. *See* Act of May 16, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141, 2141–42, *amended by* Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 3, 2007 Tex. Gen. Laws 1, 1–2. Because the offense for which the jury convicted Loun occurred prior to this amendment, our analysis of Loun's appeal is governed by the prior version of Section 9.32. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 3, 2007 Tex. Gen. Laws 1, 1–2 (an offense committed before Act's effective date governed by sections in effect when offense committed).

[3]In 1995, the Legislature amended subsection (b) of Section 9.31 without amending subsection (a). *See* Act of May 12, 1995, 74th Leg., R.S., ch. 190, § 1, 1995 Tex. Gen. Laws 1919, 1919 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.31).

serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (Vernon Supp. 2008).

The first requirement of Section 9.32, self-defense using deadly force, is that the defendant would have been justified in using nondeadly force under Section 9.31. The evidence clearly establishes Loun was entitled to use nondeadly force.

Earlier that evening, Fancher[4] and LaPelley had attended a poker game at a deer lease in Rusk County. LaPelley had paid Fancher's entry fee for the poker game. When Fancher won sixty dollars, LaPelley wanted the money. Fancher left the game without telling LaPelley where she was going. LaPelley left the game and went to the American Legion club in Henderson. Around midnight, LaPelley had an altercation with Sammy Lee Boles at the club. Boles had requested LaPelley to move his truck which was blocking Boles's vehicle. Boles testified that LaPelley had a bad attitude. At several points during the evening, LaPelley and Fancher argued over the telephone.[5] Somehow, LaPelley deduced that Fancher was at Clark's apartment.

The overwhelming weight of the evidence shows that LaPelley posed a threat to the occupants of the apartment. The record conclusively established that LaPelley was intoxicated.[6]

---

[4]Fancher was separated from her husband. Fancher's husband, who was in the Navy, was in Connecticut at the time.

[5]Among other things, LaPelley had accused Fancher, who had a handicapped child, of being a bad mother.

[6]The autopsy revealed that LaPelley's blood alcohol level was 0.19. Clark testified LaPelley was obviously drunk. Fancher testified she was under the impression LaPelley had been drinking.

6

Loun was aware that LaPelley had a history of abusing Fancher.[7] Zarate testified LaPelley made her nervous and she was scared LaPelley would hurt Fancher. Zarate testified LaPelley was "very upset" and had "a mean scowl-looking, evil -- very mean-looking face." Zarate testified she believed LaPelley posed a threat to Fancher. Clark testified she felt threatened by LaPelley. Sweeney testified Clark and Zarate indicated they believed Loun "was justified in shooting the victim because if he had not, then the victim would have or could have done something." LaPelley was positioned between the occupants of the apartment and the door. Both Fancher and Zarate testified that LaPelley had taken a step or two toward Fancher. Loun testified he feared for his safety as well as the safety of others in the apartment. The overwhelming weight of the evidence indicates a reasonable person would have believed the use of nondeadly force was necessary.

The State argues the jury could have concluded a reasonable person in Loun's position would have retreated. During one period of Texas jurisprudence, the laws of self-defense required the defendant to retreat (even if confronted in his own home) if a reasonable person would retreat under the same circumstances. *See, e.g.*, *Valentine v. State*, 587 S.W.2d 399, 402 (Tex. Crim. App. [Panel Op.] 1979). However, under the law in effect at the time of the use of force, Loun did not have a

Clark testified LaPelley had a beer can in his hand when he entered the apartment.

[7]Clark testified that Fancher had told Loun about LaPelley's prior violence toward Fancher. Krista Zarate testified LaPelley had physically abused Fancher on prior occasions. Zarate had personally seen the bruises. Clark had also seen bruises. Loun had never met LaPelley prior to the night of the shooting. Loun informed Lieutenant Craig Sweeney, a detective with the Henderson Police Department, at the scene that he had "heard something about" LaPelley mistreating Fancher.

duty to retreat before using deadly force against a person committing an offense of unlawful entry in his habitation.[8]  Subsection (b) of Section 9.32 provided the duty to retreat requirement "does not apply to an actor who uses force against a person who is at the time of the use of force committing an offense of unlawful entry in the habitation of the actor."  Act of May 16, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141, 2141–42 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32).

The overwhelming weight of the evidence established that LaPelley used force to enter the apartment and that the apartment was Loun's habitation.  Clark and Loun had been dating for four years and shared each other's apartments, alternating between Dallas and Henderson.  All of the witnesses testified that LaPelley used force to enter the apartment.[9]  Clark testified that LaPelley forced his way into the apartment, pushing Clark against the wall.[10]  Fancher testified that LaPelley "had to use effort to open the door."  Roberson testified that Clark "opened the door just a little bit,

---

[8]The charge submitted to the jury instructed that the duty to retreat requirement "does not apply to an actor who uses force against a person who is at the time of the use of force committing an offense of unlawful entry in the habitation of the actor."

[9]Lieutenant Sweeney testified he did not observe any damage to the apartment door "that you might normally think would be there" if there had been a forced entry.  On cross-examination, Sweeney admitted none of the witnesses had claimed LaPelley had "kicked the door down, that he tore the door up, or anything else . . . ."  Sweeney testified that the witnesses had told him LaPelley used force to push the door open.  While LaPelley may not have had to use extreme force to enter the apartment, all of the witnesses testified he used some force.

[10]The impact caused bruises on Clark's back.  Photographs of the bruises were introduced into evidence.

and then [LaPelley] just pushed the door open a little bit and came on in." A conclusion that Loun had a duty to retreat would be so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. The evidence is factually insufficient to support a conclusion that Loun had a duty to retreat.

The evidence, however, is sufficient to support a conclusion that Loun did not reasonably believe deadly force was immediately necessary—the third requirement of the justification. A "reasonable belief" is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42) (Vernon Supp. 2008); *see Werner v. State*, 711 S.W.2d 639, 645 (Tex. Crim. App. 1986). There is evidence that deadly force may not have been necessary.

There is some evidence LaPelley did not pose much of a threat. Loun continued to watch television while LaPelley was demanding entry. While admitting her actions did not show it, Fancher testified she was glad to see LaPelley when he drove up and that they "probably would have went home together, had we got to that point." Fancher's testimony indicates that she may not have been afraid of LaPelley. When asked the question, "The door got shut because [LaPelley] wasn't quite off the hook yet on getting his full dose of the silent treatment," Fancher replied, "Correct." Because the dispute "wasn't [his] business," Roberson testified he was not paying attention to the conversation and was playing with his cell phone. Roberson did not believe LaPelley was yelling

and affirmatively stated he did not believe LaPelley was a threat to anyone in the apartment.[11] Roberson testified he was not afraid of LaPelley. On cross-examination, Zarate testified she "pretty much thought it was going to be a fistfight."

A rational juror could have concluded the use of deadly force was unnecessary. Loun admitted he had three to four beers that night. Loun had previously served in the military as a Ranger. Paul Callaway, a command sergeant with the United States Army, testified that as a Ranger, Loun would have been trained in hand-to-hand combat. Callaway testified on direct examination that an intoxicated person would be "a fairly easy target" because their reactions would be slow.[12] Fancher testified that Loun "immediately" aimed the gun at LaPelley upon LaPelley's entry into the apartment. At trial, the State emphasized that one of the shots struck LaPelley in the back. Loun denied shooting LaPelley in the back and testified that he shot as he was "rotating back around." After LaPelley had been shot, Fancher screamed at Loun: "Why did you do this?" Fancher testified Loun looked at her, shrugged his shoulders, and walked off.[13] After he fired the shots, Loun then

---

[11]On cross-examination, Roberson admitted he did not know anything about LaPelley's prior violent behavior.

[12]Callaway admitted on cross-examination that an intoxicated person may not think rationally, which could make him more of a danger.

[13]Loun testified he looked around at everyone to make sure no one else was hurt. Loun testified he was "kind of in a daze."

took out the round in the chamber of the gun, removed the magazine, and put the gun on top of the bed covers.[14]

We note the record contains some evidence that a person may have reasonably believed deadly force was necessary. LaPelley was 6'3", 190 pounds, and legally drunk. It is uncontested that LaPelley and Loun had a brief struggle over the gun.

Loun testified he was watching television when the door flew open. Loun testified that he grabbed the gun off the coffee table,[15] chambered a round, and then held the gun beside his leg. Loun testified he then told LaPelley to "[s]top, and get out of the house."[16] When LaPelley "kept coming," Loun pointed the gun at LaPelley. Loun testified he had both hands on the weapon. Loun and LaPelley were "almost face-to-face by the time [LaPelley] finally squared up with" Loun. LaPelley struck at the gun. Loun testified at trial that he "just saw a dark, metallic-colored object"

---

[14]Loun testified he put the magazine underneath the bedcovers because he did not know how badly LaPelley had been injured and did not want LaPelley to be able to use the gun if he got back up.

[15]Roberson testified earlier in the evening he and Loun had been talking about guns. Roberson could not recall how the subject had come up, but Loun had pulled out the gun to show Roberson. Roberson testified he had asked a "bunch of different questions." Roberson and Loun testified that after they finished discussing the gun, Loun placed the gun on the coffee table. Clark testified she believed the gun was on the coffee table when LaPelley entered the room.

[16]Zarate testified Loun pointed the gun at LaPelley while LaPelley was heading toward Fancher and Loun told LaPelley to stop. Zarate testified that was the only occasion she remembers LaPelley being warned.

11

in LaPelley's hand.[17] Loun testified he was taught[18] "never let someone else gain control of a weapon," and testified he did not believe hand-to-hand combat was an option.

Loun's testimony concerning the struggle over the gun was corroborated by the other occupants of the apartment. Fancher testified LaPelley attempted to knock the gun out of Loun's hand. Zarate then testified LaPelley "swatted or hit" the hand with which Loun was holding the gun. Clark testified LaPelley slapped Loun's hand.

All of the witnesses testified that the shots were fired close together. Fancher testified that when Loun recovered his balance, Loun shot LaPelley three times in rapid succession. Zarate testified the shots were "very close together." Roberson heard a slap and three gunshots in close succession.

The forensic evidence indicates the fatal shots were fired at close range. The autopsy revealed LaPelley died from wounds inflicted by three bullets. Wade Thomas, a forensic scientist for the Tyler region of the Texas Department of Public Safety, conducted several tests to estimate the distance between LaPelley's clothing and the gun. One shot was fired when the gun was between twelve to thirty inches from LaPelley. A second shot was greater than six inches, but less than

---

[17]Loun testified at trial he could not tell whether LaPelley had any sort of a weapon in his hand. Lieutenant Sweeney testified that Loun informed him on the night of the shooting that LaPelley had a beer can in his hand.

[18]Loun had a concealed handgun license in Washington. Loun had taken a Texas concealed handgun course, but had not obtained a Texas concealed handgun license.

twenty-four inches from LaPelley. A third shot was greater than twelve inches, but a maximum distance could not be determined.

Wiley Lloyd Grafton testified as an expert witness for the defense. Grafton is an associate professor of criminal justice at the University of Louisiana in Monroe, a former Alcohol, Tobacco, and Firearms agent, a former United States Treasury agent, and a National Rifle Association counselor. Grafton testified, "I've made over probably 250 felony arrests in my career, and I never one time had an individual grab for my firearm when I pointed it at him." Grafton testified such an action indicated the victim was out of control. Grafton also testified most firearms books and instructors recommend firing three to four shots because "you may miss a shot."

A rational juror could have concluded that deadly force was not immediately necessary to protect Loun or a third party against the use or attempted use of unlawful deadly force. Nor is the conclusion so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Although we may not have reached the same conclusion, we will not substitute our opinion for the jury's conclusion. "Although an appellate court reviewing factual sufficiency has the ability to second-guess the jury to a limited degree, the review should still be deferential, with a high level of skepticism about the jury's verdict required before a reversal can occur." *Roberts*, 220 S.W.3d 524. The evidence is legally and factually sufficient to support the jury's conclusion that Loun was not entitled to use deadly force.

13

**II.    The Error in Modifying the Statutory Instruction on Parole Resulted in Some Harm**

In his third point of error, Loun argues the trial court reversibly erred in failing to give the statutorily required instruction on parole law.  Although the trial court did instruct the jury on the law concerning parole, the trial court failed to give the statutory instruction.  The charge on punishment at the third trial provided as follows, in pertinent part:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time.  Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation.  If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.
>
> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.
>
> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.
>
> You may consider the existence of the parole law and good conduct time.  However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant.  You are not to consider the manner in which the parole law may be applied to this particular defendant.

**A.    The Trial Court Erred in Modifying the Statutory Instruction**

The charge tracks the statutory language with one major exception.  Although the charge informed the jury about the existence of good conduct time, the trial court deleted the paragraph contained in the statutory instruction informing the jury that the defendant will not become eligible

14

for parole until the actual time served equals one-half of the sentence imposed. The charge omitted the following paragraph:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp. 2008).[19] Loun claims the omission of the statutory language was error. We agree.

A trial court commits error when it deviates from the statutorily mandated language by adding or deleting language. *See Villarreal v. State*, 205 S.W.3d 103, 105 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed); *Hill v. State*, 30 S.W.3d 505, 509 (Tex. App.—Texarkana 2000, no pet.). The trial court erred in omitting statutorily mandated language.

### B.       The Error Resulted in Some Harm

Finding error in the court's charge, however, merely begins the inquiry. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984) (op. on reh'g). We must now determine whether the resulting harm requires reversal. *Id.* at 171. The standard of review for errors in the jury charge depends on whether the defendant properly objected. *Mann v. State*, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998); *Almanza*, 686 S.W.2d at 171 (op. on reh'g); *Gornick v. State*, 947 S.W.2d 678,

---

[19]We note this article has been amended since the trial. Because the amendments are not relevant to this case, we have cited the current version of the article.

680 (Tex. App.—Texarkana 1997, no pet.). If a proper objection was raised, reversal is required if the error is "calculated to injure the rights of defendant." *Almanza*, 686 S.W.2d at 171. In other words, an error that has been properly preserved is reversible unless it is harmless. *Id.* If a defendant does not object to the charge, reversal is required only if the harm is so egregious that the defendant has not had a fair and impartial trial. *Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd).

The State argues Loun's objection to the charge was inadequate to preserve error. During the charge conference, Loun's counsel objected. The following colloquy occurred, in pertinent part:

THE COURT: . . . Any objection from the defense?

[Defense Counsel]: It is, Your Honor. We submit Defendant's 1 for court purposes only.

THE COURT: That is your version?

[Defense Counsel]: Yes.

THE COURT: And you are saying I'm not listening to the statutory conditions of probation and also the issue of -- having served a fixed percentage of any actual sentence?

[Defense Counsel]: Yes, sir.

THE COURT: It might have been something else but those are the two things we talked about in chambers.

[Defense Counsel]: Well, the conditions of probation are in the statute and there has been testimony from the supervisor of the adult probation that these are always conditions of probation and therefore it should be before the jury. Also --

16

THE COURT: Actually, the Legislature didn't make it mandatory. The Legislature listed which things can be. Now, in practice, virtually every one of the conditions in your draft meet -- say the same thing the statute says.

[Defense Counse]: And then after the conditions there is another paragraph about what happens if a condition of probation is violated. That should be in there. Also, down on page two next to the last paragraph it states about the eligibility for parole. You have allowed it to be in there about parole and good time but you did not put in there since this is a murder case which is automatically one half sentence must be served. We ask that that be in there. Other than that, we have no objection to the charge.

THE COURT: Thank you. The objections are overruled . . . .

Although the record suggests the defense submitted a proposed charge, i.e., "Defendant's 1," the record does not contain the proposed charge. The State argues the defense's objection was not sufficiently specific or distinct enough to make the trial court aware of his complaint.

We must first decide whether Loun failed to preserve error when he failed to ensure the written proposed charge was introduced into the record. The State notes the record does not contain Loun's proposed charge. In *Vasquez v. State*, 919 S.W.2d 433 (Tex. Crim. App. 1996), the Texas Court of Criminal Appeals stated, "[w]e have interpreted articles 36.14 and 36.15 as dealing with those two distinct situations: an *objection* to the charge and a *requested special instruction*, respectively." *Id.* at 435 (citing *Frank v. State*, 688 S.W.2d 863 (Tex. Crim. App. 1985)). In this case, the defense is complaining about an error in the charge given to the jury, rather than requesting an additional special instruction. The complaint is that the instruction in the charge is incomplete, rather than a request for a new instruction. We conclude Article 36.14 should govern error

17

preservation in this case. Under Article 36.14, the defendant is merely required to object and obtain an adverse ruling to preserve any error. *Id.* If the objection was sufficient, the error was preserved even though the written requested charge was not introduced into the record. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007) ("in no event shall it be necessary for the defendant or his counsel to present special requested charges to preserve or maintain any error assigned to the charge . . ."); *Rodriguez v. State*, 31 S.W.3d 736, 737 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see also Sibley v. State*, 956 S.W.2d 832, 837 (Tex. App.—Beaumont 1997, no pet.) (because objection preserved error, counsel was not ineffective for failing to submit a written proposed jury instruction). Therefore, Loun was only required to object and obtain an adverse ruling.

The next issue is whether the objection obtained was sufficient to call the trial court's attention to the error. The State argues the objection was insufficient because it was combined with a request for a list of community supervision conditions and was not sufficiently specific. We note an objection can be so vague and multifarious that it fails to give the trial court notice of the complaint. *See Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994). The objection in this case does not fall into this category of insufficient objections. The objection was sufficient to give the trial court notice of both complaints. An objection is sufficient if it "isolates the portion of the charge which is alleged to be deficient and identifies the reason for its deficiency." *Taylor v. State*, 769 S.W.2d 232, 234 (Tex. Crim. App. 1989). The objection informed the court of the missing paragraph and requested it be included. It was sufficient to make the trial court aware of the

18

complaint. The trial court summarized the objection as to whether the charge must inform the jury of the requirement of "having served a fixed percentage of any actual sentence." Loun preserved error for appellate review.

Where charge error has been preserved by objection, reversal is required as long as the error is not harmless. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). We determine harm in light of the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence; the argument of counsel; and any other relevant information revealed by the record as a whole. *Mann*, 964 S.W.2d at 641; *Rudd*, 921 S.W.2d at 373. The purpose is to illuminate the actual, and not just the theoretical, harm to the accused. *Rudd*, 921 S.W.2d at 373; *Hines v. State*, 978 S.W.2d 169, 175 (Tex. App.—Texarkana 1998, no pet.).

Some harm is shown if this error was calculated to injure the defendant. *Almanza*, 686 S.W.2d at 171; *Aguilar v. State*, 914 S.W.2d 649, 651 (Tex. App.—Texarkana 1995, no pet.). The presence of any harm, regardless of degree, is sufficient to require reversal. *Abdnor*, 871 S.W.2d at 732. There is no burden of proof on the defendant; our determination is simply made from a review of the record. *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005); *see Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008).

In *Hill* and *Villarreal*, this Court found egregious harm when the trial court deviated from the statutory language on parole law. *Villarreal*, 205 S.W.3d at 110; *Hill*, 30 S.W.3d at 509. Our decision in *Villarreal* was based, in part, on jury notes indicating the jury had considered how parole

law would be applied to the defendant. *See Villarreal*, 205 S.W.3d at 105. While there are no jury notes concerning parole law in this case, Loun presented evidence in support of his motion for new trial that the jury did consider the application of parole law.

In support of his motion for new trial, Loun presented testimony from one of the jurors, Wayne Gibson, that the jury considered how parole would be applied to Loun. Despite being instructed not to consider how parole law would apply to Loun, the jury apparently considered the issue. Gibson testified the jury was confused about how much time Loun would actually serve. Several members of the jury expressed the opinion that if "you don't give him a lot more he won't serve hardly any." Gibson testified he believed four years would be sufficient, but he agreed to ten years when someone stated Loun would only serve one-third of his sentence.

The harm analysis in this case is complicated by the fact that Gibson's testimony is inadmissible evidence. Texas law clearly provides that a juror "may not testify as to any matter or statement occurring during the jury's deliberations" except for "(1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve." TEX. R. EVID. 606(b); *see White v. State*, 225 S.W.3d 571, 573 (Tex. Crim. App. 2007). A juror's discussion about the application of the parole law to the defendant's sentence does not constitute an outside influence. *Hines v. State*, 3 S.W.3d 618, 623 (Tex. App.—Texarkana 1999, pet. ref'd); *see Richardson v. State*, 83 S.W.3d 332, 361–62 (Tex. App.—Corpus Christi 2002, pet.

20

ref'd). The State, though, failed to object in any way to the admission of this evidence.[20] Because no objection was made, the evidence was admitted for all purposes.

Although the State argued Loun "needs to go to the penitentiary and he needs to go for a long time," it is clear the jury was considering the lower end of the range of punishment. The jury submitted a note indicating it was considering "probation." The jury ultimately decided on a term of ten years. There is evidence the jury in this case was inaccurately informed and misled[21] by the court's charge. We find that the error in the charge caused some harm. We sustain Loun's third point of error.

---

[20]We note appellate courts formerly presumed, in nonjury trials, that the trial court ignored inadmissible evidence. *See, e.g.*, *Tolbert v. State*, 743 S.W.2d 631, 633 (Tex. Crim. App. 1988). The Texas Court of Criminal Appeals overruled that line of cases in *Gipson v. State*, 844 S.W.2d 738 (Tex. Crim. App. 1992) (concluding harmless error analysis should be conducted instead); *cf. Ovalle v. State*, 13 S.W.3d 774, 784 n.34 (Tex. Crim. App. 2000).

[21]The State argues in its brief that Loun is asking this Court "to reward him by reversing the decision of the jury as to punishment because one of the jurors was not allowed to violate the instructions contained in the court's charge." We note the jury was instructed not to consider how parole law would apply to Loun. We further note we generally presume the jury follows the trial court's instructions. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). We acknowledge the law concerning parole law instructions is rife with contradictions. A court is required to inform the jury about good conduct time and the possibility of parole and inform the jury it can consider the existence of these doctrines, but then instruct the jury not to consider how such doctrines will be applied to this particular defendant. If the jury follows the instruction to not consider how parole will be applied to this particular defendant, an erroneous jury instruction will not impact its deliberations. On the other hand, one could argue courts should not ignore the reality that jurors will have some knowledge of the existence of parole and may be tempted to consider the application of parole law despite being instructed not to. The Texas Legislature has determined courts should provide the jurors with a more accurate, even if somewhat misleading, summary of the law. It is not our role to question the wisdom of the policy decided by the Texas Legislature. Our role is to guarantee the Legislature's policy decisions are carried out.

21

**III.    The Trial Court Did Not Err in Refusing to Instruct the Jury About Possible Conditions of Community Supervision**

Loun's trial counsel requested the trial court to list some of the conditions of community supervision that could be imposed by the trial court, should the jury recommend a probated sentence. On appeal, Loun claims the trial court erred in denying this request. Although a trial court may provide such an instruction, a trial court is not required to submit a list of potential conditions of community supervision in its charge. *Cagle v. State*, 23 S.W.3d 590, 594–95 (Tex. App.—Fort Worth 2000, pet. ref'd); *Cortez v. State*, 955 S.W.2d 382, 384 (Tex. App.—San Antonio 1997, no pet.); *McNamara v. State*, 900 S.W.2d 466, 467–68 (Tex. App.—Fort Worth 1995, no pet.). Loun's fourth point of error is overruled.

**IV.    The Error in Admitting the Prior Testimony of Roberson Resulted in Some Harm**

At the third trial, the trial court admitted the prior recorded testimony of Roberson at the second trial over the objection of Loun. On appeal, Loun argues the trial court erred in admitting the evidence because the State failed to show Roberson was unavailable. We review a trial court's admission of evidence for abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion if its decision is outside the zone of reasonable disagreement. *Id.*; *Kelly v. State*, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992).

**A.    The State Failed To Prove Roberson Was Unavailable**

Loun objected to the prior recorded testimony alleging the State failed to make a proper predicate of availability under Rule 804(b) of the Texas Rules of Evidence. Rule 804(b)(1) provides

"testimony given as a witness at another hearing of the same or a different proceeding" is not excluded if the witness is unavailable as a witness and "if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." TEX. R. EVID. 804(b)(1). Loun does not dispute that the evidence meets the requirements of Rule 804; Loun only challenges whether Roberson qualified as unavailable.

The State argues Roberson was unavailable under Rule 804(a)(5), which provides a witness is unavailable if he "is absent from the hearing and the proponent of [his] statement has been unable to procure [his] attendance or testimony by process or other reasonable means." *See* TEX. R. EVID. 804(a)(5). At trial, the parties argued as follows:

> [Defense Counsel]: Your Honor, under 804 hearsay exceptions, without them bringing a witness they have to prove that declarant is unavailable which has not been proven in this case. That is why we are saying the testimony be excluded based on hearsay.

> [Prosecutor Biggs]: Your Honor, the witness is unavailable. County can't pay for him to come back down here from Maine again. He's got prior recorded testimony.

> THE COURT: Oh, this is the sailor?

> [Prosecutor Atkinson]: This is Rashaan Roberson.

> [Defense Counsel]: That is not one of the reasons that the county cannot pay for.

> [Prosecutor Atkinson]: I don't think that prior recorded testimony requires unavailability of the declarant.

> [Defense Counsel]: Rule of evidence 804B.

23

THE COURT: Kind of an unusual situation is that witness has testified, has been subject to cross-examination of this case. The trouble is he wasn't subject to physical appearance before this jury. Objection is going to be overruled. I sure hope the State thinks it's on safe ground.

Later in the conversation, the State stated, "We can't force him to come outside the State of Texas. I have no way to procure his attendance." The trial court granted the defense a running objection.[22] The State does not argue it could not locate Roberson's current address.[23]

The State must make some good-faith efforts to produce the witness at trial or to show any efforts would be futile. The State's only explanations in this case were 1) it would be too expensive and 2) the incorrect legal conclusion the State had "no way to procure his attendance." The State argues, even though there is no evidence it attempted to subpoena Roberson, it should not be required to perform a useless act because, according to the State, a subpoena does not reach across state lines. We note the State "is not required to engage in clearly futile activities before a trial court can, in its discretion, determine that the State made good-faith efforts to produce a witness at trial." *Ledbetter v. State*, 49 S.W.3d 588, 594 (Tex. App.—Amarillo 2001, pet. ref'd). Compulsory process for a witness located outside of Texas can be obtained under the "Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Proceedings." *See* TEX. CODE CRIM.

---

[22]We note, since the objection was made outside the presence of the jury, a running objection was not necessary to preserve error. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Ethington v. State*, 819 S.W.2d 854, 859 (Tex. Crim. App. 1991). But it never hurts to secure a running objection.

[23]Loun argues the record establishes the State knew Roberson's location, directing us to the State's list of possible witnesses. This list contains a Rhode Island address for Roberson.

24

PROC. ANN. art. 24.28 (Vernon 1989). The record does not contain any evidence that attempting compulsory process in this case would be futile.

Because there is no evidence of any good-faith efforts, the State failed to show it made good-faith efforts to secure Roberson's presence. This decision is outside the zone of reasonable disagreement. *See Otero-Miranda v. State*, 746 S.W.2d 352, 355 (Tex. App.—Amarillo 1988, pet. ref'd, untimely filed) (mere issuance of unserved subpoenas to secure two Mexican citizen witnesses not good-faith efforts); *Reyes v. State*, 845 S.W.2d 328 (Tex. App.—El Paso 1992, no pet.) (asking witness's family to locate witness in Mexico three days prior to trial not a good-faith effort). The trial court abused its discretion in admitting the prior recorded testimony.

**B.      The Error Resulted in Harm**

Loun urges us to apply the constitutional error harm analysis which requires reversal unless we can conclude beyond a reasonable doubt that the error made no contribution to the accused's punishment. Loun, though, has not alleged constitutional error.[24] Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that we must disregard a nonconstitutional error if it does not affect a defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A nonconstitutional error is harmless

---

[24]We note Loun states in his brief: "The right of a defendant to confront his accuser is closely guarded. *See generally, Dedesma v. State*, 806 S.W.2d 928, 930 (Tex. App.—Corpus Christi 1991, pet. ref'd). Both the evidentiary hearsay rules and the Sixth Amendment to the U.S. Constitution are designed to protect this much-valued safegaurd in our legal system." The error raised—a violation of Rule 804(b)—is not constitutional. A violation, if any, of the Sixth Amendment has not been raised as a separate issue. Further, the single case cited by Loun discussing the Confrontation Clause did not concern prior recorded testimony. *See Dedesma*, 806 S.W.2d at 930. We may overrule any multifarious or inadequately briefed point of error. TEX. R. APP. P. 38.1.

if, after reviewing the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the verdict. *See Casey*, 215 S.W.3d at 885. In determining whether the error resulted in harm, we review the whole record and consider the nature of evidence supporting the verdict, the character of the alleged error, the extent that it was emphasized by the State, and how the erroneously admitted evidence might have been considered in connection with other evidence in the case. *See Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).

Roberson was the most favorable eyewitness for the State and the only eyewitness called by the State. Roberson stated he did not believe LaPelley was a threat to anyone in the apartment. Because Fancher did not testify at the third trial,[25] Roberson was the only eyewitness who testified LaPelley did not pose a threat to anyone. The testimony formed an important part of the State's case. During its closing argument, the State emphasized Roberson's testimony. The State argued Roberson believed LaPelley's presence was "no big deal." We cannot reach a fair assurance that the inadmissible evidence did not have a substantial and injurious effect or influence on the jury. The error resulted in some harm to the accused. We sustain Loun's fifth point of error.

## V.    Conclusion

We conclude the evidence is legally and factually sufficient. The trial court did not err in refusing the requested instruction on possible conditions of community supervision. The trial court

---

[25]During the second trial, Fancher, LaPelley's girlfriend, also testified that she did not believe LaPelley posed a threat to anyone.

26

did err in omitting a portion of the statutory instruction on good conduct time and eligibility for parole. This error resulted in some harm to Loun. The trial court also erred in admitting the prior recorded testimony of Roberson and this error resulted in some harm. Because the reversible errors occurred during punishment, we reverse the trial court's judgment on punishment only and remand for a new trial on punishment.

 

Bailey C. Moseley
Justice

Date Submitted:     September 8, 2008
Date Decided:     November 20, 2008

Publish